UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
K.M., on behalf of her minor child, A.M.,

                              Plaintiff,

                                                       04-CV-1031
                -against-                            (TCP)(ARL)

                                                       MEMORANDUM
MANHASSET UNION FREE SCHOOL            AND
DISTRICT,                                                  ORDER
                              Defendant.
----------------------------------------------------------------X

PLATT, District Judge.

        Before the Court is a Complaint brought pursuant to 20 U.S.C. § 1415(i)(2)(A) to appeal the decision of a State Review Officer of the State Education Department. For the following reasons, the decision of the State Review Officer is affirmed in all respects.

## BACKGROUND

**I.    Factual Background**

        Plaintiff, K.M., brings this suit on behalf of her daughter, A.M., a former student at Defendant, Manhasset Union Free School District ("Defendant" or "District"). Plaintiff claims that A.M. was improperly denied due process and a free and appropriate public education (a "FAPE") pursuant to 42 U.S.C. §1983, the Individuals with Disabilities Education Act, 20 U.S.C. §1400, et seq. and 34 C.F.R. Part 300, et seq. ("IDEA"), New York State Education Law §§ 4401,

4404, and 4407, and the Constitution of the State of New York, Art. 11, §1. Plaintiff claims that A.M. was improperly classified as "Multiply Disabled" rather than "Learning Disabled" ("LD"). Plaintiff alleges that this improper classification prevented A.M. from receiving a FAPE, led to emotional distress, caused K.M. to incur out of pocket expenses for A.M., and impaired A.M.'s educational development. (Pl.'s Mem. at 1-2). K.M. also claims that A.M. demonstrated slow writing speed and attention problems as early as kindergarten but that these issues were not addressed by special education professionals until A.M. was in the eighth grade. (Pl.'s Mem. at 3).

In May of 2000, when A.M. was in the eighth grade, Plaintiff privately arranged for a neuropsychological evaluation of A.M. administered by Paula Zuffante, Ph.D., at the Schneider Children's Hospital (the "Schneider report"). (Def.'s Exh. 3).[1] K.M. arranged for the private testing because she was worried about A.M.'s declining grades and because the Middle School's psychologist, Mrs. Sternberg, refused to test A.M. as she was not failing any of

---

[1] Citations to Exhibits refer to exhibits entered into evidence during the Impartial Hearing. References to pages from the transcript of the Impartial Hearing will be denoted as "Tr." The hearing transcript and all exhibits from the hearing have been provided to the Court as part of the "Record," which consists of Four Volumes. As neither party has requested oral argument or a hearing before this Court, this decision is based upon the parties' submissions, including Plaintiff's exhibits provided under separate cover, and the Record.

her classes. (Tr. at 601, 625-29). Although A.M. did seem to have some difficulty with her course work in the first quarter of eighth grade, by the end of that school year, her grades had improved, and she had earned a final grade of an A in almost half of her classes. (Def.'s Exh. 12).

According to the Schneider report (Def.'s Exh. 3), A.M.'s verbal intellectual abilities were found to be Superior to Very Superior; her nonverbal intellectual abilities were estimated to be in the High Average to Superior range; and her academic abilities were in the Very Superior range. A.M. was described as having below average idea development and descriptive detail in her written work, forgetting to turn in assignments, procrastinating, having anxiety over assignments, and avoiding homework. In addition to assessing A.M.'s academic and intellectual abilities, the examiner concluded that A.M. was experiencing depression, anxiety, social alienation, and a lack of support from adults and peers. The Schneider report suggested that A.M.'s anxiety may have been negatively impacting her academic performance and that A.M. had consistently demonstrated a pattern of being well controlled at school and impulsive and aggressive at home. A.M. reported numerous fights with her mother, including one in which she threatened to cut herself and another in which the police had to be called. The Schneider report concluded that A.M.'s behavioral patterns did not warrant the diagnosis of Attention Deficit/Hyperactivity Disorder ("ADHD") in

light of her anxiety and depression. It also suggested that the Committee on Special Education ("CSE") review the Schneider report and create an Individual Education Program ("IEP") to best meet A.M.'s needs, as she had not performed up to her academic abilities and required additional support from within the school. (Def.'s Exh. 3).

In the Spring of 2000, K.M. scheduled a meeting with A.M.'s guidance counselor, the High School Principal, and the Middle School Principal to discuss the Schneider report and to address K.M.'s growing concerns for her daughter's future in high school. The results of the Schneider report were discussed, and it was agreed that A.M.'s ninth grade teachers would periodically send progress reports home to K.M. (Tr. at 328; Def.'s Exhs. 10,11 and 30).

During the summer between eighth and ninth grade, K.M. sent A.M. to a private program in New Hampshire to improve her organizational and time management skills and generally prepare her for the ninth grade. (Tr. at 630-31). A.M. attended this program without consultation with or support from the District. (Tr. at 631).

In January of 2001, Plaintiff again complained to the District that A.M. was not doing well in school. A.M.'s guidance counselor, Jane Grappone ("Grappone"), suggested that A.M. attend a general education Writing Center and informed K.M. that she could request a CSE referral and further evaluations

through the Special Education Office if she desired. (Tr. at 335-36).

In her ninth grade year, A.M. was enrolled in honors math and biology and received above average grades in both. A.M. received all A's and B's with the exception of C's in French and physical education. The majority of her teachers' comments were positive. (Def.'s Exh. 13).

In May of 2001, Grappone and Dr. Donald Lee ("Dr. Lee"), the school psychologist for the high school, met with K.M. after she again expressed concern for her daughter's declining grades, continued behavioral and emotional difficulties, and recent hospitalization for a suicide attempt, which K.M. insisted was merely an attempt to scare K.M. and not an "actual" suicide attempt. (Tr. at 136-38). Dr. Lee stated that A.M.'s problems in school were emotionally based and that she should be classified as "Emotionally Disturbed" or "ED," as the Schneider report's findings suggested. K.M. objected to the ED classification. Dr. Lee further explained the procedure for requesting evaluations and referrals to the CSE. (Tr. at 341-42). Also during this meeting, K.M. stated that she was afraid to allow A.M. to be on medication as she did not want to have pills around the house. (Tr. at 333-34).

After Dr. Lee's meeting with K.M., he scheduled a meeting with A.M. Following that meeting in the Spring of 2001, Dr. Lee reported that there was no consistency between what K.M. had stated and what A.M. had told him

when he met with her privately. (Tr. at 138). A.M. indicated to Dr. Lee that she did not feel overwhelmed in school, although she did have some difficulty with writing. In fact, A.M. did not describe academics as a problem at all. (Tr. at 139). A.M. stated in this meeting that the pressure from her mother at home was relentless and unbearable. (Tr. at 140).

Following her meeting with Dr. Lee, K.M. referred A.M. to the CSE for evaluation in an effort to have her classified as Speech and Language Impaired ("SLI"). K.M. presented a private speech and language evaluation by Renee Toueg ("Toueg"), a speech and language pathologist. (Def.'s Exh. 4). Toueg's report declared A.M. to be within the average range for her age level in both expressive and receptive language. (Def.'s Exh. 4). The only test on which A.M. scored below average was the rapid digits naming test, which examines one's ability to retrieve phonological information from long term memory within a designated time span. (Def.'s Exh. 4). Toueg recommended that A.M. receive orthographic language therapy to improve her ability to copy information.

At K.M.'s request, the CSE convened in early September of 2001 to evaluate A.M. and to address K.M.'s request for an SLI classification. At this CSE meeting, Margaret Blair ("Blair"), the District Coordinator for Special Education, found that the private speech and language evaluation conducted by Toueg indicated that A.M. was within the average to high average levels for

verbal performance. (Tr. at 43). Blair attempted to direct the focus of the CSE meeting to the emotional issues highlighted in the Schneider report but K.M. refused to address these issues. (Def.'s Exh. 9). K.M. then determined that the psychological examination she received for A.M. in the year 2000 was inaccurate and stated that she would secure an additional analysis. The CSE recommended that until K.M. acquired the desired test, A.M. should participate in the general education support services provided by the high school. (Def.'s Exh. 9).

The CSE reconvened in January of 2002 at K.M.'s request. (Def.'s Exh. 22). K.M. failed to produce the promised examination but provided instead a handwritten letter from A.M.'s pediatrician, dated December 3, 2001, stating that A.M. was learning disabled. (Pl.'s Exh. 9; Tr. at 62). K.M. requested that A.M. be classified as Learning Disabled ("LD") and that A.M. be allowed extra time on her upcoming mid-term examination. (Def.'s Exh. 22). A.M.'s private therapist was unable to attend the meeting and had yet to produce an additional report. K.M. again refused to address A.M.'s emotional issues, declared the original Schneider report as inaccurate and refused to allow the CSE to review it, and reiterated that she was going to get another private psychological evaluation. (Tr. at 57-58). The CSE continued to recommend that A.M. be classified as ED in order to receive services under the IDEA. (Tr. at 66-67).

On January 31, 2002, pursuant to the IDEA, K.M. requested that

an impartial hearing be held to resolve her dispute with the District over its refusal to classify A.M. as LD. An Impartial Hearing was held on April 9, 2002, by Hearing Officer Monk ("IHO Monk"). That hearing was adjourned, however, to permit the CSE to review an additional psychological evaluation conducted by Dr. Julia Osborn ("Dr. Osborn"), which was submitted to the CSE on April 8, 2002. (Tr. at 653-54).

The CSE reconvened on April 22, 2002. (Def.'s Exh. 25). Dr. Osborn was invited to attend but declined to do so. The April 8, 2002 report diagnosed A.M. with a written expressive disorder, ADHD and difficulty with mood regulation. (Pl.'s Exh. 4). Dr. Osborn recommended assistance in essay writing and study skills, extended time for reading and tests, withdrawal of A.M. from her AP history class, less rigorous academic courses, mental health services, and summer courses in subject areas in which A.M. felt confident. (Pl.'s Exh. 4).

The April 22, 2002 meeting of the CSE resulted in a mutually agreeable classification of A.M. as Multiply Disabled ("MD"), which took into account A.M.'s emotional issues and her ADHD diagnosis. (Def.'s Exh. 25). The CSE also recommended that A.M. participate in the Learning Lab one period per day to improve her organizational, study and time management skills, that she receive counseling once in each six day cycle, and that she receive extended time on tests. K.M. consented to these recommendations at the meeting. (Def.'s Exh.

25). It was further agreed that the IEP goals were to be reduced to writing at a later meeting with a sub-committee of the CSE. K.M. then withdrew her request for an impartial hearing.

When A.M.'s schedule was changed to add the Learning Lab, K.M. telephoned Blair and indicated that she wanted A.M. out of the Learning Lab and back into her regular study hall period. (Tr. at 96-97). Blair told K.M. that she would have to schedule another CSE meeting to remove A.M. from the Learning Lab and place her back in study hall. (Tr. at 94). Blair offered to schedule the CSE meeting, but K.M. did not wish to do so. (Tr. at 98).

The CSE sub-committee reconvened on May 20, 2002 to consider the Learning Lab issue, but the meeting was canceled because K.M. had a migraine headache. (Tr. at 215). On May 23, 2002, K.M. sent a letter to Dr. Lee indicating her strong opposition to the Learning Lab. (Def.'s Exh. 27). Blair responded to K.M.'s letter in writing and explained again that K.M. must request a CSE meeting if she disagrees with the Learning Lab placement. (Tr. at 94; Def.'s Exh. 28).

Despite these disagreements between K.M. and the CSE, A.M. continued to perform relatively well while in tenth grade with occasional minor set backs. Her lowest grade was a D in AP European History, which the teacher indicated did not reflect the effort that A.M. put into the course. The majority of

the final grades she received were B's with two A's and one C. Generally, teacher comments for A.M. throughout the year indicated good effort and participation in class. (Def.'s Exh. 14).

## II. Procedural History

Rather than request a CSE meeting as K.M. had been instructed to do, K.M. requested another impartial hearing on June 11, 2002. (Def.'s Exh. 29). She subsequently withdrew that request and submitted a third request on July 26, 2002. (Def.'s Exh. 1).

On February 23, 2003, in an Impartial Hearing, IHO Monk affirmed the District's Multiply Disabled classification of A.M. and denied K.M.'s requests. (Def.'s Exh. C). An appeal to the State Education Department's State Review Officer, Robert Bentley ("SRO Bentley"), ensued, and on November 14, 2003, SRO Bentley denied all of K.M.'s claims and dismissed the appeal. SRO Bentley affirmed the CSE's classification of A.M. as Multiply Disabled and denied K.M. any compensation for the private evaluations and tutoring. K.M. then took an appeal to this Court.

## DISCUSSION

## I. Standard of Review

The IDEA requires that a reviewing court receive the records of the administrative proceedings, hear additional evidence at the request of a party,

and base its decision upon a preponderance of the evidence in granting such relief as the court determines is appropriate. 20 U.S.C. § 1415(i)(2)(C). The Supreme Court and the Second Circuit have interpreted the IDEA as strictly limiting judicial review of State administrative decisions. Board of Educ. v. Rowley, 458 U.S. 176, 206 (1982) ( . . . "the provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review"). Reviewing courts must give "due weight" to the State administrative proceedings and recognize that the responsibility for developing and implementing educational policy is best left to the States and local educational agencies in conjunction with a child's parent or guardian. Walzak v. Florida Union Free School Dist., 142 F.3d 119, 129 (2d Cir. 1998); Rowley, 458 U.S. at 206-07.

## II. Analysis

Bearing the above considerations in mind, this Court finds that there is no basis to disturb the well-reasoned decisions of both IHO Monk and SRO Bentley, which affirmed the District's classification of A.M as Multiply Disabled and refused to award K.M. reimbursement for expenses incurred in having A.M. evaluated psychologically or otherwise and in obtaining private educational services.

### A. Improper Classification

Plaintiff's first contention is that Defendant improperly classified A.M. as a Multiply Disabled student instead of as a Learning Disabled student, which K.M. had originally requested. As an initial matter, it should be noted that K.M. and her attorney agreed to the MD classification at the April 22, 2002 meeting with the CSE. (Tr. at 86; Def.'s Exh. 25). Plaintiff states that she reluctantly agreed to this "classification in order to get A.M. classified and, most importantly, to have services begin." (Pl.'s Mem. at 9). Plaintiff's reluctant assent is belied by her refusal to have A.M. classified as Emotionally Disturbed when she entered the ninth grade. Had Plaintiff truly been concerned with having services for A.M. begin as soon as possible, she could have consented to the ED classification well-before A.M. had progressed through her secondary schooling.

Moreover, there is adequate evidence in the record before this Court to support the District's classification of A.M. as Multiply Disabled. SRO Bentley aptly described how Plaintiff's requested classification for her daughter of Learning Disabled is completely inappropriate in the instant case. A classification of LD specifically excludes learning problems that are primarily the result of emotional disturbance. 8 N.Y.C.R.R. § 200.1[zz][6]. Given the extensive findings, even by Plaintiff's own experts, that A.M. suffers from

emotional problems, SRO Bentley's conclusion is amply supported. The record is replete with instances of A.M.'s acting out at home, including an attempted suicide, fights with her mother, and threats to cut herself. (Tr. at 137, 140; Def.'s Exh. 3). Moreover, a number of professionals who evaluated A.M. concluded that these emotional issues affected her academic achievement. (Pl.'s Exh. 4; Def.'s Exh. 3, 4).

The District's classification of A.M. as MD correctly reflected the concomitant impairments that affected her ability to learn. See 8 N.Y.C.R.R. § 200.1[zz][8]. A.M.'s emotional problems were well-documented. Considered in conjunction with Dr. Osborn's diagnosis of ADHD, the MD classification of A.M. was more than appropriate. Dr. Osborn's testimony at the hearing before IHO Monk also demonstrated that A.M.'s needs would be best addressed by a Multiply Disabled program. (Tr. at 853; Pl.'s Exh. C).

Accordingly, the Court finds that the District's Multiply Disabled classification was appropriate and affirms the decision of SRO Bentley on this aspect of Plaintiff's claim.

**B.     FAPE**

K.M. also contends that Defendant failed to provide A.M. with a FAPE. At the heart of Plaintiff's complaint is her claim that because of A.M.'s improper classification and consequently inappropriate IEP, A.M.'s rights under

the IDEA were violated. (Pl.'s Mem. at p. 17).

In <u>Board of Education v. Rowley</u>, the Court identified 20 U.S.C. § 1401(8) as the statutory provision relevant to defining a FAPE:

> The term "free appropriate public education" means special education and related services that (A) have been provided at public expense, under public supervision and direction and without charge, (B) meet the standards of the State Educational Agency, (C) include an appropriate pre-school, elementary and secondary school education in the State involved, and (D) are provided in conformity with the individualized education program required under § 1414(a)(5) of this title.

458 U.S. 176, 188 (1982). The Court noted that the IDEA contains no requirement that States make the most of the potential of handicapped children. 458 U.S. at 189-90. To the contrary, the IDEA requires only that the education provided to a handicapped student confer some meaningful educational benefit upon the student. <u>Id.</u> at 200.

As noted above, the District's classification of A.M. as MD was appropriate. With respect to A.M.'s IEP, the IEP included A.M.'s participation in the Learning Lab and individual counseling. These elements of A.M.'s IEP were also agreed upon by Plaintiff at the April 22, 2002 meeting of the CSE. (Def.'s Exh. 25). The record presented to the Court on this appeal seems to support Defendant's contention that Plaintiff only objected to these elements of A.M.'s IEP after she received a copy of the IEP and "saw the parenthetical '(ED/OHI

[Other Health Impaired])' in the minutes . . . ." (Def.'s Mem. at 19). It is plain to this Court that Plaintiff's opposition to an ED classification, even as part of an MD classification, severely limited her ability to fairly consider the District's IEP.

This Court agrees with IHO Monk and SRO Bentley that the IEP proposed by the District was more than adequate under the IDEA to address A.M.'s educational needs as a handicapped student. The Learning Lab provided an appropriate support service to a mainstreamed student such as A.M. (Tr. at 401). In the Learning Lab, A.M. was provided with assistance in the subject matters in which she was weak and in organizational skills. (Tr. at 399). A.M. was also able to receive individual help from her teachers when needed. (Tr. at 421). A.M. was able to address her writing difficulties as well in the Learning Lab by assistance working on editing of papers, reviewing assignments, and outlining text books. (Tr. at 413). Furthermore, in light of A.M.'s emotional issues, counseling was appropriate and welcomed by A.M., who testified that it was a good place to go to get things off her chest. (Tr. at 550).

Moreover, there is no merit to Plaintiff's contention that A.M. should have received one on one tutoring in language therapy and organizational/study skills. As the Court held in Rowley, the goal of the IDEA is not to make the most of each student's potential, but to provide a "basic floor of opportunity" consistent with equal protection. 458 U.S. at 200. The IDEA was

-15-

not enacted to ensure that students excel in advanced placement or honors level courses, as Plaintiff would have the Court hold. As such, Defendant's IEP was sufficient to provide A.M. with a FAPE.

### C. No reimbursement

A board of education may be required to pay for educational services obtained for a child by a parent only where: (i) the services offered by the board of education were inadequate or inappropriate; (ii) the services selected by the parent were appropriate under the IDEA; and (iii) where equitable considerations support the parent's claim for reimbursement. <u>School Committee of Burlington v. Dept. of Educ.</u>, 471 U.S. 359 (1985); <u>Florence County Sch. Dist. Four v. Carter by Carter</u>, 510 U.S. 7 (1993).

Plaintiff herein has not met her burden under the first prong of <u>Burlington</u>, in that the District has demonstrated the appropriateness of its program. Similarly, Plaintiff has not demonstrated that the private services that she obtained were necessary. As such, this Court affirms the decision of SRO Bentley, which denied Plaintiff's request for reimbursement for private evaluations and tutoring.

### D. 1983 claim

In her complaint, Plaintiff makes a claim for damages for the severe psychological injury suffered by A.M. under 42 U.S.C. § 1983 ("Section

1983") and the IDEA. (Complaint, Exh. A). As Defendants correctly note, Plaintiff cannot sustain a claim for damages under either statutory provision.

In Quackenbush v. Johnson City Sch. Dist., 716 F.2d 141, 147 (2d Cir. 1983), the Court held that the procedural safeguards provided for by Section 1415 of the IDEA are exclusive remedies that cannot be "supplemented nor replaced by" an action under Section 1983. The Court therein concluded that a plaintiff's remedies under Section 1983 were only triggered when a plaintiff had been denied procedural safeguards under Section 1415. Id. at 148. Where as here, Plaintiff does not contend that she was denied any procedural safeguards under the IDEA, a claim for damages under Section 1983 may not lie.

In addition, Plaintiff's claim for monetary damages is not a remedy provided for by the IDEA. See Polera v. Bd. of Educ. of the Newburgh Enlarged City Sch. Dist., 288 F.3d 478, 486 (2d Cir. 2002). The intent behind the IDEA was to provide for educational services and not for compensation for an alleged personal injury. Id. Accordingly, Plaintiff is not entitled to damages under the IDEA.

## **CONCLUSION**

For the foregoing reasons, the decision of the State Review Officer is affirmed in all respects.

SO ORDERED.

                                                          s/s Thomas C. Platt
                                                          Thomas C. Platt, U.S.D.J.

Dated:  Central Islip, New York
           April 20, 2006